CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 1 4 2006

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| OMORO RAGLAND, | ) | **Civil Action No. 7:02-cv-00786** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| RON ANGELONE, et al., | ) | **By: Hon. James C. Turk** |
| Defendants. | ) | **Senior United States District Judge** |

Plaintiff Omoro Ragland, an inmate of Virginia Department of Corrections ("VDOC") who is proceeding pro se, complains that the VDOC's grooming policy, Departmental Operating Procedure 864 ("DOP 864"), punishes him for his religious practice of wearing his hair and beard uncut by reducing his privileges, increasing the security restrictions to which he is subject, and reducing his opportunity to earn good conduct time. Ragland asserts that the penalty provisions of DOP 864 violate his rights under the First Amendment, as actionable under the Civil Rights Act, 42 U.S.C. §1983, with jurisdiction vested under 28 U.S.C. §1343; the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, et. seq., and various state laws, and the Universal Declaration of Human Rights Article 18.[1] The defendants filed motions for summary judgment, arguing that RLUIPA is unconstitutional on several grounds and that Ragland is not entitled to relief under any constitutional provision or RLUIPA.[2]

---

[1] In the facts section of his complaint, Ragland mentions that he filed grievances on one occasion claiming deprivation of due process in a DOP 864 hearing and on another occasion, claiming that officials transferred him because of his race. In the claims section of his complaint, however, Ragland does not state any claim asserting deprivation of due process or improper transfer on the basis of race. Therefore, the court does not consider these issues as claims presented in this action. In any event, for reasons stated in defendants' brief, these claims are without merit.

[2] In December 2002, defendants filed a motion for summary judgment, asserting that RLUIPA is unconstitutional and addressing the merits of Ragland's claims. The United States intervened to

1

Ragland responded to defendants' motions, making the matter ripe for the court's consideration.[3] Upon review of the record, the court concludes that the motions for summary judgment must be granted.

## I. Background

Section 3 of RLUIPA prohibits governments from enacting regulations, including rules of general applicability, or otherwise taking actions that impose a "substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government demonstrates that imposition of that burden furthers "a compelling governmental interest" by "the least restrictive means." § 2000cc-1(a)(1)-(2). This strict-scrutiny standard applies any time such a burden on religious exercise occurs "in a program or activity that receives Federal financial assistance," or "affects, or removal of that substantial burden would affect," interstate

---

defend the statute. In January 2003, this court decided in a similar case that the section of RLUIPA applicable to inmates violated the Establishment Clause. See Madison v. Riter, 240 F. Supp. 2d 566 (W.D. Va. Jan. 23, 2003), rev'd 355 F.3d 310 (4th Cir. Dec. 8, 2003), cert. denied, 125 S. Ct. 2536 (March 30, 2005). While the constitutionality issues were litigated in the Madison case, the court stayed all action in Ragland's case and dismissed all pending motions without prejudice to refiling after the stay was lifted. In March 2005, the Supreme Court held that RLUIPA does not violate the Establishment Clause, Cutter v. Wilkinson, 125 S. Ct. 2113 (2005), and thereafter, the Court denied certiorari in Madison. The court then reinstated Ragland's case to the active docket and granted defendants an opportunity to file dispositive motions. Defendants filed a new motion for summary judgment, incorporating by reference the portions of their previous motion that addressed the merits of Ragland's claims.

[3]Plaintiff filed requests for production of documents and interrogatories before defendants responded to his complaint in 2002. When the court stayed the case pending the resolution of the constitutionality issues in Madison, the court also granted defendants' motion for protective order. After the case was reinstated to the active docket in 2005 and defendants filed their renewed motion for summary judgment, plaintiff responded to the motion without renewing his requests for discovery or indicating that these requests were necessary to his response. Moreover, the court has reviewed his discovery requests and finds that they have either been addressed in defendants' motions and/or are not necessary to plaintiff's ability to respond to the motions.

2

or foreign commerce. Id. The statute creates a private cause of action for persons who allege that a government has substantially burdened their religious conduct. § 2000cc-2(a). Plaintiff bears the burden of persuasion on whether the challenged law places a substantial burden on his exercise of religious belief; if plaintiff proves this threshold issue, the government program is put to the burden of proving that the imposition of the burden furthers a compelling interest by the least restrictive means. § 2000cc-2(b).

On December 15, 1999, the VDOC began enforcing DOP 864, setting forth new personal grooming standards for all inmates who are incarcerated in VDOC facilities. Def. Mem., Dkt. #33, Johnson Affid., Enclosure A ("DOP 864"). The policy covers hair care, hair style, beards, mustaches, fingernails and general hygiene. Defendants assert that this grooming policy, modeled after a similar policy implemented by the South Carolina Department of Corrections in August of 1997, was designed to promote safety, security, and sanitation, and to facilitate the identification of inmates. DOP 864 directs that male inmates must keep their hair no more than one inch in depth and thickness. Male inmates may not wear beards, goatees, or sideburns below the middle of the ear unless they obtain an order from medical staff exempting them from shaving. Mustaches must be neatly trimmed and may not extend beyond the corner of the mouth or over the lip. Men who get a no-shave order for medical reasons must keep their facial hair trimmed to one eighth of an inch in length or shorter. DOP 864 prohibits male inmates from wearing certain hair styles such as braids, plaits, dreadlocks, cornrows, ponytails, buns, mohawks, partially shaved heads, designs cut into the hair, or any style which could conceal contraband.

Defendants offer evidence that an inmate's failure to comply with the DOP 864 standards

3

poses potential risks regarding security, health, and inmate identification. Thus, the DOP authorizes prison officials to manage such inmates as potential risks to institutional order and safety. See DOP 864.4(J). Inmates who refuse to cut their hair, beards, and/or fingernails, or to alter their hair styles to comply with the specifications of this procedure will be given an order to do so. If an inmate continues to refuse to comply, he will be charged with a violation of Major Offense Code 201, disobeying a direct order, and be placed on pre-hearing detention. If convicted, that inmate will serve an isolation sentence. If he is convicted of two more violations, he will serve two additional, longer isolation sentences and then be referred to the Institutional Classification Authority for assignment to segregation, possible reclassification to a higher security level institution, and a possible reduction in the rate at which he can earn good time or earned sentence credit. The inmate will remain assigned to segregation until the inmate fully complies with the grooming standards.

Ragland states that he is of the Rastafarian religion, Nyahbinghi Order, and is a member of the International Rastafari for Inity Embassy in North Carolina and an associate member of the Rastafari Universal Order Rebirth 2000 in Florida. He states that as a Rastafarian, he has taken the Biblical vow of the Nazarite by which one pledges to JAH ("God") that no razor shall touch his head or beard until the time his consecration to JAH is completed.

Ragland alleges the following sequence of facts from which his claims arise. When DOP 864 took effect in December 1999, Ragland was in special housing at South Hampton Correctional Center ("SHCC"). Because he refused to cut his hair or shave his beard, he immediately lost the privilege of attending all program activities and was restricted to legal visits and telephone calls. Between December 15, 1999 and January 27, 2000, officials charged

4

Ragland three separate times for refusing to comply with DOP 864. He was convicted on these charges and penalized with isolation sentences. In October 2000, officials transferred Ragland to the special housing unit at Keen Mountain Correctional Center ("KMCC"). Because he continued to refuse to comply with the grooming policy, officials continued to assign him to special housing at KMCC, then at Bland Correctional Center from March to July 2001, and then at Buckingham Correctional Center from July 2001 to the time he filed this complaint in July 2002.[4] Ragland filed repeated grievances about the effects of DOP 864, complaining that the policy punished him for practicing his religious beliefs and deprived him of the right to rehabilitative and educational programs. In February 2001, officials reclassified Ragland as a high security risk, placing him in a category of inmates that do not earn any good conduct time. This change pushed his anticipated release date from January 2009 to July 2009.

Ragland complains that strict enforcement of the grooming policy punishes his religious exercise through the deprivation of programs and privileges, which has caused him to lose the ability to earn good conduct time. He asserts that this "disciplinary" aspect of the policy is disproportionate to his "misconduct." He claims that the policy thus places a substantial burden on his religious beliefs and that its provisions are not the least restrictive means by which officials could achieve their stated interests. Ragland argues that the policy should include an exception for inmates who fail to comply with the grooming requirements for religious reasons such that he could wear his hair and beard uncut and also retain the security classification, good time earning capacity, and privileges that he enjoyed before implementation of the policy.

_____

[4]Ragland is currently assigned to the special housing unit at SHCC.

5

## II. Analysis

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Upon motion for summary judgment, the court must view the facts, and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Rule 56(c) mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317, 322 (1986). However, the moving party is not entitled to summary judgment if the parties' dispute over a material fact is "genuine." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. Id. When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the non-moving party may not rest on the mere allegations or denials of the pleadings. Fed. R. Civ. P. 56(e). Instead, the non-moving party must respond by affidavits or otherwise and present specific facts showing that there is a genuine issue of disputed fact for trial. Id.

### A. The grooming policy is constitutional.

The court must grant the motions for summary judgment as to Ragland's claims that the VDOC grooming policy violates his rights under the First Amendment Free Exercise Clause, the Eighth Amendment, and the Fourteenth Amendment Due Process and Equal Protection Clauses. Prison regulations that infringe on inmates' constitutional rights are valid so long as they are

6

rationally related to legitimate penological interests.  Washington v. Harper, 494 U.S. 210

(1990);  O'Lone v. Shabazz, 482 U.S. 342 (1987); Turner v. Safley,  482 U.S. 78 (1987).

Applying this rational basis test, courts have upheld the VDOC's grooming policy against all of

Ragland's constitutional challenges.  See DeBlasio v. Johnson, 128 F. Supp. 2d 315 (E.D. Va.

2000), aff'd 00-6999, 00-7707, 00-7705, 00-7708, 00-7706, 00-7700, 2001 WL 721398 (4th Cir.

2001); Ashann-Ra v. Commonwealth of Virginia,112 F.Supp.2d 559 (W. D. Va. 2000).

Accordingly, the court must grant defendants' motions for summary judgment as to Ragland's

claims that the grooming policy itself is unconstitutional.[5]

### B.  RLUIPA is constitutional.

Defendants' constitutional challenges to RLUIPA have also been decided.  In Cutter v.

Wilkinson, 125 S. Ct. 2113 (2005), the United States Supreme Court held that RLUIPA does not

violate the Establishment Clause.  See also Madison v. Riter, 355 F.3d 310 (4th Cir. 2003)

(same).  Moreover, this court recently held that RLUIPA is a valid exercise of the Spending

Power and that it does not violate the Tenth or Eleventh Amendments or the Separation of

Powers doctrine.  Madison v. Riter, No. 7:01-cv-00596, 2006 WL 181362 (W.D. Va. Jan. 25,

2006) (published).  Therefore, the court must deny the motions for summary judgment on

grounds that RLUIPA is unconstitutional.

### C.  Defendants are entitled to qualified immunity.

To the extent that Ragland has any claim for monetary damages under RLUIPA, the court

---

[5]This determination also resolves Ragland's claim under the Universal Declaration of Human
Rights, Article 18, of the United Nations, as this provision does not create any legal rights or causes
of action beyond those already available to him under § 1983 and the First Amendment.  See, e.g.,
Crow v. Gullet, 706 F.2d 856, 858 (8th Cir. 1983).

concludes that defendants are entitled to qualified immunity. State officials receive qualified immunity against suits for damages if a reasonable officer facing the same situation would not have known that his actions violated plaintiff's clearly established constitutional or statutory rights. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Put another way, qualified immunity shields a government official from suit for monetary damages if his challenged conduct was objectively reasonable in light of legal rules that were clearly established at the time of his actions. See, e.g., Saucier v. Katz, 533 U.S. 194, 201-02 (2001).

Ragland certainly had no claim for relief under RLUIPA before the effective date of the statute in September 2000. At that time, VDOC officials could reasonably have believed that the grooming policy did not violate inmates' rights under RLUIPA. First, neither the Supreme Court nor the Fourth Circuit had yet ruled that RLUIPA was constitutional or that prison grooming policies violated its precepts. Second, in March 2000, the United States District Court for the District of Columbia had expressly found that the VDOC's grooming policy furthered compelling state interests in prison security and safety by the least restrictive means. Jackson v. District of Columbia, 89 F. Supp. 2d 48, 65-69 (D. D.C. 2000), vacated on other grounds, 254 F.3d 262 (D.C. Cir. 2001). The plaintiffs in Jackson were federal inmates housed in a Virginia prison and brought their claims under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb, et seq. This statute, which was ruled inapplicable to state prisons and prisoners, see City of Boerne v. Flores, 521 U.S. 507 (1997), requires federal prison officials to justify any substantial burden placed on inmates' religious practice under the same strict scrutiny standard that RLUIPA now mandates for state prisons---by showing that the burden furthers a compelling penological interest by the least restrictive means. The district court in Jackson

8

found that DOP 864 furthered compelling interests in security, health, and inmate identification and that uniform enforcement of the policy was the least restrictive means to accomplish these goals. 89 F. Supp. 2d at 65-69. Although the judgment in the <u>Jackson</u> case was later overturned on other grounds, [6] VDOC officials could reasonably have relied on the district court's reasoning in <u>Jackson</u> that DOP 864 satisfied the compelling interest test in RFRA. Consequently, they could also reasonably have believed that the grooming policy met the all-but-identical test in RLUIPA and so did not violate inmates' clearly established rights under that later statute. As such, the defendant officials in this case are entitled to summary judgment on the ground of qualified immunity as to any claims Ragland may have for monetary damages.

### D. The grooming policy meets RLUIPA's strict scrutiny standard.

Defendants' qualified immunity defense does not dispose of Ragland's claim for injunctive relief from the ongoing restrictions he suffers because he wears his hair and beard long. <u>See</u> <u>Hewitt v. Helms</u>, 482 U.S. 755, 767 (1987). For purposes of their motions for summary judgment, defendants do not contest Ragland's assertions that his sincere religious belief requires him to wear his hair and beard uncut; they also do not contest that the grooming policy restrictions place a substantial burden on Ragland's religious exercise. Because defendants thus do not contest that Ragland states a prima facie challenge to DOP 864 under RLUIPA, they must establish that the grooming policy furthers compelling state interests by the

---

[6]When plaintiffs in the <u>Jackson</u> case appealed the district court's ruling, the United States Court of Appeals for the District of Columbia Circuit held that the lower court should have dismissed the complaint because the inmates had not exhausted their administrative remedies before filing their lawsuit, as required under 42 U.S.C. § 1997e(a). <u>Jackson</u>, 254 F.3d at 270-71. In so doing, however, the appellate court did not find any fault with the district court's analysis of DOP 864 under RFRA.

least restrictive means and so does not violate RLUIPA. § 2000cc-1(a); 2(b). The court concludes that defendants have met this burden.

Congress' imposition of the strict scrutiny standard in RFRA and RLUIPA to rules of general applicability represents a legislative return to the court-crafted compelling interest test previously applied to all Free Exercise of Religion claims. Gonzales v. O Centro Esprita Beneficente Unia do Vegetal, 126 S. Ct. 1211, 1217 (Feb. 21, 2006) (finding that the government failed to demonstrate a compelling interest in barring religious sect's sacramental use of a controlled substance, in violation of RFRA). Thus, in applying the RLUIPA standard, courts seek instruction from strict scrutiny precedents, addressing constitutional or RFRA claims. Id. To defend a neutral regulation of general applicability, the government must "demonstrate a compelling interest in uniform application" of the regulation "by offering evidence that granting the requested religious accommodations would seriously compromise its ability to administer the program." Id. at 1223. Government officials' mere speculation regarding possible adverse effects of allowing a religious exception is insufficient to prove that the interest in uniform applicability is compelling; they must present evidence of administrative harm that constitutes a compelling interest. Id. Generally, a reviewing court must examine any existing exceptions to the policy and closely consider the feasibility of requested exceptions. Id.

Context matters, however, in applying the strict scrutiny test. Id. at 1221. Congress clearly expressed its intention that courts applying the RFRA/RLUIPA standard in the prison context should give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 125

S. Ct. at 2123 (citations to congressional records omitted); Hamilton v. Schriro, 74 F.3d 1545, 1553 (8th Cir. 1996).[7] Though the Supreme Court and the Fourth Circuit have not yet spoken regarding the appropriate level of deference to which prison officials are entitled under RFRA and RLUIPA, prior strict scrutiny case law addresses this question. Even before adopting the Turner/O'Lone rational basis test, the Supreme Court tempered the strict scrutiny test in the prison context, emphasizing the need for great judicial deference to the professional judgment of experienced prison officials in crafting innovative prison policies to maintain security and order. See, e.g., Pell v. Procunier, 417 U.S. 817, 827 (1974) (finding that regulation limiting prisoner interviews with media personnel did not violate inmates' First Amendment rights). While courts should not abdicate their responsibility to protect inmates' constitutional rights,

> judgments regarding prison security are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to [stated considerations of institutional security], courts should ordinarily defer to their expert judgment in such matters.

Id.

Other courts have adopted the Pell balancing approach in applying the strict scrutiny test under RFRA and RLUIPA. See, e.g., Hoevenaar v. Lazaroff, 422 F.3d 366, 370 (6th Cir. 2005) (upholding prison grooming policy under RLUIPA based on deference to prison officials' judgment); Hamilton v. Schriro, 74 F.3d 1545, 1553-54 (8th Cir. 1996) (same under RFRA). Specifically, officials must prove that the restriction addresses prison interests of the "highest

---

[7]The Hamilton opinion notes that, according to congressional records, the purpose of RFRA was to impose the strict scrutiny standard in the manner that courts had applied it to inmates' Free Exercise claims before O'Lone, such that "only regulations based upon penological concerns of the "highest order" could outweigh an inmate's claims." 74 F.3d at 1553 (citations omitted).

11

order" and that its limitations on inmates' free exercise rights are "no greater than necessary to protect the governmental interest involved." Hamilton, 74 F.3d at 1553-54. Prison officials "must do more than offer conclusory statements and post hoc rationalizations for their conduct," Id. at 1554 (citation omitted). See also Murphy v. Mo. Dept. Of Corr., 372 F.3d 979, 988-89 (8th Cir. 2004) (applying same standard to RLUIPA claims). Likewise, courts need not "blindly accept any policy justification offered by state officials," but they must "give proper deference to the opinions of the veterans of the prison system." Hoevenaar, 422 F.3d at 371. Affidavits or testimony from experienced prison officials, predicting in specific terms the unworkability of less restrictive alternatives, can provide sufficient evidence that a regulation meets the RLUIPA standard.[8] Id. In such cases, a reviewing court generally need not also require prison officials to produce data proving that the predicted problems will occur or did occur before the policy was implemented.[9] Id. at 371-72. A prisoner's ability to exercise his protected right in some fashion

---

[8]In this vein, the Ninth Circuit has held that prison officials "must set forth detailed evidence . . . identifying the failings in the alternatives advanced by the prisoner" and thus demonstrate that they have "actually considered and rejected the efficacy of less restrictive measures." Warsoldier v. Woodford, 418 F.3d 989, 1000 (9th Cir. 2005) (finding that inmates had shown likelihood of success on RLUIPA challenge to grooming policy at low security prison because officials had not offered anything more than conclusory statements that the policy furthered compelling interests by least restrictive means).

[9]In Hoevenaar, the district court granted inmates an injunction against enforcement of a prison grooming policy despite testimony from experienced prison officials that making individual exemptions to the policy for religious reasons would "cause resentment among the other inmates, a copycat effect, and problems with enforcement of the regulations due to staff members' difficulties in determining who is exempted and who is not." 422 F.3d at 371. The district court noted a lack of evidence that such problems occurred under a previous policy, which allowed such exceptions. Id. The Sixth Circuit reversed, finding that the district court did not give proper deference to the testimony from experienced prison officials that the suggested individualized exceptions did not "sufficiently protect the state's interest in safety and security," and that the inmates had not offered substantial evidence that officials' response to security concerns was exaggerated. Id. at 371-72.

12

despite the challenged regulation weighs heavily in favor of a finding that the regulation is no more restrictive than warranted by prison needs. Pell, 417 U.S. at 828. Using these or similar balancing factors, courts have upheld prison grooming requirements under RFRA and RLUIPA. Hoevenaar, 422 F.3d at 370; Hamilton, 74 F.3d at 1554-55; Phipps v. Parker, 879 F. Supp. 734, 736 (W.D. Ky. 1995); Diaz v. Collins, 872 F.Supp. 353, 359 (E.D. Tex. 1994).

**1. The grooming policy furthers compelling penological interests.**

Defendants have offered substantial evidence establishing that the VDOC grooming policy furthers compelling penological interests in security, staff safety, inmate identification, and inmate health. As a corrections official with nearly forty years of experience in various aspects of prison administration, VDOC Director Gene Johnson describes in detail the policy and the manner in which it addresses each of these security problems. Def. Br., Dkt. 33, G. Johnson Affid. In addition to his professional opinions and explanations, Johnson presents descriptions of numerous instances where inmates' long hair or beards have caused these specific security problems at VDOC prisons in the past. Id. at ¶18. An inmate can conceal weapons or contraband in his long face or head hair. The extra time it takes for officers to conduct searches of inmates' long hair means less staffing for other security concerns and/or more cost. In addition, officers risk injury during searches from sharp objects concealed in inmates' hair and risk potential health problems from contact with the various substances, such as feces, that inmates sometimes use to bind dreadlocks.[10] Inmates also use hairstyles to symbolize gang membership. Prisoners with

---

[10]Defendants relate past instances when VDOC inmates have used their head hair or facial hair to conceal shanks, homemade handcuff keys, and drugs. Id. at ¶18(b), (c), (d), (f), (l), (o). On at least one occasion, a corrections officer searching an inmate's dreadlocks cut his finger on a razor blade hidden in the hair. Id. at ¶18(n).

long hair and/or beards can rapidly change their appearance to facilitate an escape attempt or frustrate identification in a disciplinary infraction or crime committed during incarceration. In addition, ease of positive inmate identification facilitates the orderly, overall operation of each institution. Long hair and beards also present a range of potential health risks to the wearer and to those with whom he comes in contact—everything from insect or parasite infestation to skin and scalp conditions.[11] On this evidence, the court concludes that DOP 864 addresses compelling state interests. See, e.g., Jackson, 89 F. Supp. 2d. at 66 (finding under RFRA that VDOC's stated interests furthered by DOP 864 were compelling and citing other cases).

Furthermore, defendants' evidence establishes a compelling interest in uniform enforcement of the grooming policy within the general population in order to address the stated security and health concerns. Gene Johnson states that in his professional opinion, "strict, uniform enforcement of the grooming policy standards facilitates the safe and orderly operation of [the] entire prison system." Johnson Affid. at ¶7. He also opines that creating a blanket religious exception to the policy would render the policy ineffectual by forcing prison officials simply to accept increased risks of concealed contraband, quick changes in prisoner identity, and hair-related health problems. Id. at ¶23. Regardless of the reason an inmate chooses not to comply with DOP 864 hair and beard requirements, his uncut hair and/or beard make him a higher security risk than a compliant inmate. To facilitate better management of that increased risk under the existing policy, officials will place any noncompliant inmate immediately into segregated confinement. Id. at ¶12-13. In segregation, an inmate who might use his hair or beard

---

[11]Defendants relate one past instance when officials discovered that an inmate who was continuously ill had suffered repeated bites from black widow spiders who were nesting in his long hair. Id. at ¶18(a).

to conceal contraband can be closely monitored and is isolated from other prisoners from whom he might receive, or to whom he might pass, contraband. Id. An inmate who might plan to alter his appearance as part of an escape plan or to shield his identity from prison officials, will have reduced opportunity for escape or identity confusion. Id. An inmate whose longer hair or beard might promote the spread of parasites or contagious skin diseases will not have close, personal contact with other inmates. Id. Thus, the housing reassignment uniformly imposed by the policy directly addresses the stated penological interests, by eliminating the risk to general population inmates and staff and by allowing the risks to be closely monitored in the segregation unit. At the same time, the policy allows Ragland to keep his hair uncut in keeping with his religious beliefs.

The exceptions now included in the grooming policy are easily distinguishable from the requested exception for religious beliefs. The medical exception to the no beard requirement takes effect only after a medical professional makes an objective decision that shaving threatens the inmate's health and issues a no-shave order. DOP 864.4(E)(3). Application of the hair length exception for female inmate is also based on objective criteria–the inmate's gender and the fact that a one-inch-long hair style is generally considered an extreme style for women, unlike men. On the contrary, determining the true nature of an inmate's religious beliefs and needs rests primarily on subjective criteria that can be easily manufactured or faked.

In addition, the medical exception and the variations for female hair length do not leave completely unaddressed the stated concerns behind the policy. The medical exception does not allow the inmate to leave his beard completely uncut; rather, he must keep it neatly trimmed to no longer than 1/8 of an inch, a length unlikely to conceal contraband, create health risks, or significantly alter appearance. DOP 864.4(E)(3). Although female inmates may wear their hair

15

down to shoulder length, they are not permitted to wear hair styles that facilitate concealment of contraband. DOP864.4(D). Female inmates also have much less history than do male inmates of committing violence and other security breaches, such as secreting weapons and contraband or attempting escape. Johnson Affid. at ¶15. As a small percentage of the VDOC prison population--approximately 3000 females among a total population of 30,000 inmates--female inmates as a group simply do not present security and health concerns of the same magnitude as male inmates do. Id.

Johnson also addresses the suggested alternatives to maintaining all noncompliant inmates in segregation. Id. at ¶21-22. It has been suggested that inmates who are noncompliant for religious reasons be required to wear a different color prison garb within the general population or that they be congregated in one part of a single prison with general population privileges. Johnson asserts that these alternatives leave unaddressed most, if not all, of the stated problems with inmate searches, identity of individual inmates, and inmate/staff health. Id. at 21. In addition, exceptions of this nature could encourage inmates to "play the system" so as to be assigned to a particular prison or housed with a particular group of inmates. Id. See also Jackson, 98 F. Supp. 2d at 68 (explaining why DOP 864 was implemented and why alternatives are unreasonable). Clearly, any incentive for inmates to grow their hair in order to receive privileges not otherwise available to them increases the very risks that the grooming policy seeks to reduce.

Johnson also explains that transferring inmates with religious need for longer hair and/or beards to a corrections system that has no grooming policy is also an unreasonable alternative. Johnson Affid. at ¶22. Again, such a practice would encourage inmates to profess religious need in order to receive a transfer. Inmates must meet specific criteria before being considered for an

out-of-state transfer, such as good behavior and a waiting period. Id. The number of inmates requesting transfers to another state, usually to be closer to family, is already much greater than the VDOC can readily accommodate. Id. Allowing inmates with a professed religious need for a transfer to push to the head of the waiting line, without requiring that they meet other transfer criteria, would constitute state favoritism of certain religions and unjustifiably punish inmates seeking transfers for other reasons. Furthermore, inter-system transfer of prisoners normally works on a barter scheme, with one prison system trading a group of prisoners with another system. Id. Thus, the VDOC could not guarantee placement elsewhere for inmates seeking transfer because of the grooming policy.

Giving the required deference to Johnson's expert views and considering the direct evidence defendants present of past problems with inmates' uncut hair, the court concludes that any religious exception to uniform enforcement of the policy to segregate noncompliant inmates would "seriously compromise" the VDOC's ability to achieve effective administration of the grooming policy. Thus, the court finds that defendants have demonstrated a compelling interest in uniform enforcement of the policy. Gonzales, 126 S. Ct. at 1223. Furthermore, Ragland has not demonstrated, by substantial evidence or otherwise, that uniform enforcement of the grooming policy's provision to segregate noncompliant inmates from the general population is an "exaggerated response" to the stated risks that the policy addresses. Whether or not Ragland personally has ever or would ever actually hide contraband in his hair, seek to change his identity, or fail to keep himself and his hair clean is beside the point. His uncut hair presents these risks, and defendants have a compelling interest in alleviating such risks in like manner as when any inmate fails to comply with the policy–by segregating him.

17

## 2. The grooming policy meets the least restrictive means standard.

Ragland primarily complains that the disciplinary penalties included in the grooming policy and the restrictions he faces in segregation "punish" him for practicing his religion. Because he wears his hair long, he has been in segregation for years, under the restrictions imposed on all high risk inmates assigned to that status. On his record, he has three disciplinary convictions for violating the grooming policy and has served time in isolation. His segregation status limits his privileges to participate in educational or rehabilitation programs, make telephone calls, have frequent visits, showers, or out-of-cell recreation. Over time, his ability to earn good conduct credit against his term of confinement has been reduced.[12] Ragland asserts that these restrictions, particularly the reduction in his ability to earn good time, are disproportionate to his "misconduct." Because these consequences of segregation status do not directly address the problems the defendants have identified with inmates' uncut hair, Ragland argues that this aspect of the present policy is not the least restrictive means to address his noncompliance with the grooming requirements for religious reasons.

Gene Johnson states: "Blanket religious exemptions on matters that can be of equal or greater importance to other inmates who have no religious reason for policy exemption clearly

---

[12]The grooming policy provides that continued failure to comply with grooming requirements "should result in referral to the Institutional Classification Authority for . . . possible reclassification to a higher security level institution and a reduction in GCA/ESC class level." DOP 864.4(J)(2)(d). The policy further provides:

> No offender will be released to a general population setting until he/she complies with grooming standards. Offenders who refuse to comply with or chronically disobey grooming standards will not be eligible for reclassification to a less restrictive housing assignment (e.g. release from segregation) or a lower security level institution or for an increase in their class level until such time as they have complied with this procedure.

DOP 864.4(J)(3).

has the potential to foster animosity among the prisoner population." Johnson Affid. at ¶23. Johnson does not, and need not, elaborate on the specific security risks created by invoking animosity within the segregation unit's population of high security inmates. To be so classified, such inmates have generally already demonstrated either persistent refusal to behave within the dictates of prison regulations or a propensity for violence, or both. Creating animosity among such a group clearly presents an unacceptable risk to staff and to the religious inmates themselves. Johnson adds, "The presence of a policy exemption also creates an incentive for inmates to try and place themselves within the exemption." Id. If religious inmates in segregation received an increased ability to earn good time, purchase a wider variety of commissary items, make more phone calls, or have more visits than other segregation inmates, what incentive would any segregation inmate have to cut his hair? The rate of religious "conversion" would no doubt multiply exponentially, and segregation units would have little need of a barber.

Ragland has not offered substantial evidence that segregation restrictions are disproportionate to the level of security risk that his long hair presents. He does not describe any manner in which the VDOC could except him from these penalties, based on his religious beliefs, without incurring additional security risks--that nonreligious inmates in the same security classification would resent such differential treatment and retaliate with some sort of violence or that such inmates would attempt to receive the exception themselves through pretended religious conversions. Thus, the court must defer to prison officials' judgment in crafting segregation restrictions so as to control as effectively as possible the difficult segregation population. The court must also defer to Johnson's veteran view that any exception to these restrictions would

Case 7:02-cv-00786-JCT   Document 38   Filed 03/14/06   Page 19 of 22   Pageid#: 138

create new and unacceptable risks. Most importantly, Ragland fully retains his right to practice his religious belief that his hair and beard not be cut. This fact, more than any other, weighs heavily in favor of finding that the grooming policy is no more restrictive than necessary to further its stated goals, and the court so finds. See Pell, 417 U.S. at 828.

The court in Jackson noted that the inmates' strongest argument against the VDOC grooming policy was based on the fact that other prison systems, including the Federal Bureau of Prisons ("BOP"), have not found it necessary to institute grooming policies restricting hair and beard length, although they undoubtedly have similarly compelling interests in "security, gang prevention, inmate identification, and health and sanitation." 89 F. Supp. 2d at 68. The Jackson defendants offered this fact as proof that the VDOC grooming policy could not be the least restrictive means to address these common interests. The court responded:

> This argument is patently flawed. To accept the logic of this argument the court would have to conclude that the least restrictive means necessary to serve the interests of one jurisdiction's prison system is the only lawful means to serve the same interests of another jurisdiction's system though they may be entirely different in terms of their history, inmate population, structure and funding. To state this proposition is to refute it. The drafters of the RFRA did not intend to require a "one size fits all" approach to evaluating rules of neutral applicability in any context and certainly not in the context of prison condition litigation.

Id. In a similar vein, Gene Johnson states,

> I frankly cannot fathom that any reputable corrections administrator would not agree that long hair and beards present additional security and health concerns that a grooming policy such as ours addresses. I nonetheless recognize that some departments of corrections, including I believe the Federal Bureau of Prisons, do not have grooming policies. I can only imagine that the administrators of those systems have determined to accept what they believe to be the level of risk, rather than to adopt a policy that they perhaps believe would present them with other difficult issues in managing their institutions.

G. Johnson Affid. at ¶19.

The Supreme Court insists that courts must defer appropriately to the expertise of prison officials in matters of prison administration even when reviewing a prison regulation under the RLUIPA strict scrutiny standard. Cutter, 125 S. Ct. at 2123. This court believes that any court ruling which would force VDOC officials to make the same choices as prison officials in other jurisdictions have made, in balancing the established risks of inmates' uncut hair against the many other issues involved in managing a prison system, would be entirely inconsistent with the high Court's deference mandate.

### E. Conclusion

For the stated reasons, the court concludes that the VDOC grooming policy, DOP 864, does not violate Ragland's rights under RLUIPA. Given his religious need to leave his hair and beard uncut, he presents VDOC officials with significant risks. Defendants have established that these risks are compelling and that DOP 864 directly alleviates these risks. They have further demonstrated a compelling interest in uniform enforcement of DOP 864 grooming standards in the general prison population. Finally, the policy accomplishes its purposes by the least restrictive means. This policy is not among those "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations" that Congress sought to ameliorate in enacting RFRA and RLUIPA. Murphy, 372 F.3d at 988 (quoting portions of congressional record) (citations omitted). The court will grant defendants' motions for summary judgment on the ground that defendants have not violated plaintiff's rights under RLUIPA, the Constitution, or the Universal Declaration of Human Rights Article 18. The court declines to exercise supplemental jurisdiction over plaintiff's state law claims and dismisses

such claims without prejudice, pursuant to 28 U.S.C. § 1367(c). An appropriate order will issue this day.

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of this Order, or within such extended period as the court may grant pursuant to Rule 4(a)(5). The Clerk is directed to send certified copies of this memorandum opinion and accompanying order to plaintiff and to counsel of record for the defendants.

ENTER: This _14th_ day of March, 2006.

Senior United States District Judge